# United States Court of Appeals
## For the First Circuit

No. 02-2664

CONSERVATION LAW FOUNDATION and OCEANA,

Plaintiffs, Appellants,

v.

DONALD L. EVANS, et al.,

Defendants, Appellees,

and

FISHERIES SURVIVAL FUND,

Intervenor, Appellee.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Richard G. Stearns, U.S. District Judge]

Before

Lipez, Circuit Judge,

Campbell, Senior Circuit Judge, and

Howard, Circuit Judge.

Eric A. Bilsky with whom Sylvia F. Liu and Roger M. Fleming
were on brief for appellants.
Anna T. Katselas, Attorney, U.S. Department of Justice,
Environment & Natural Resources Division with whom Thomas L.
Sansonetti, Assistant Attorney General, Environment & Natural
Resources Division, Jeffrey Bossert Clark, Deputy Assistant

Attorney General, Environment & Natural Resources Division, Mauricia Baca, John Almeida, Todd S. Kim, Attorneys, Environment & Natural Resources Division and Gene S. Martin, Office of Regional Counsel, National Oceanic and Atmospheric Administration (Of Counsel), were on brief, for appellees Donald L. Evans, et al.

David E. Frulla with whom Shaun M. Gehan, Brand & Frulla, P.C., H. Reed Witherby and Smith & Duggan, LLP, were on brief, for intervenor, appellee Fisheries Survival Fund.

---

February 26, 2004

---

**HOWARD**, <u>Circuit Judge</u>. Two conservation groups challenge adverse summary judgment rulings in an action alleging violations of the Magnuson-Stevens Fishery Conservation and Management Act (the Magnuson-Stevens Act), 16 U.S.C. §§ 1851, 1853, 1854, and the Administrative Procedure Act (the "APA"), 5 U.S.C. §§ 553, 706. Conservation Law Foundation ("CLF") and Oceana (f/k/a American Oceans Campaign) allege that in implementing Framework Adjustment 14 to the Atlantic Sea Scallop Fishery Management Plan ("Framework 14"), the National Marine Fisheries Service ("NMFS") and other federal defendants[1] failed to meet their procedural and substantive obligations under governing law. The district court found that Framework 14 was lawful. We affirm.

## I.    Factual and Procedural Background

On May 31, 2001, the plaintiffs initiated an action challenging Framework 14, a rule that adjusted certain restrictions on sea scallop fishing in the Atlantic coastal waters.[2] The

---

[1]The plaintiffs also sued Donald Evans, in his official capacity as Secretary of the United States Department of Commerce, and the National Oceanic and Atmospheric Administration ("NOAA"). The Secretary of Commerce is the chief officer charged with managing the marine fisheries of the United States. NOAA is an agency within the Department of Commerce, and NMFS is a part of NOAA. Except where otherwise indicated, the federal defendants are referred to collectively as "NMFS."

[2]In 1976, in effort to prevent overfishing, the Magnuson-Stevens Act created eight regional councils charged with developing fishery management plans to regulate commercial fishing of local fish stocks. See <u>Associated Fisheries of Maine</u> v. <u>Daley</u>, 127 F.3d 104, 106 (1st Cir. 1997) (citing 16 U.S.C. § 1852). The New England Fishery Management Council (the "Council") manages the

plaintiffs challenged Framework 14 on both substantive and procedural grounds.  First, they alleged that NMFS failed to meet its substantive management obligations under the Magnuson-Stevens Act, 16 U.S.C. §§ 1851(a)(9), 1853(a)(7) & (a)(11), and the APA.[3] Second, they claimed that NMFS's failure to provide a 15-day public comment period violated the Magnuson-Stevens Act, 16 U.S.C. § 1854(b), and the APA, 5 U.S.C. §§ 553, 706(2)(D).  The plaintiffs asked the district court to declare Framework 14 in violation of the governing statutes and to "remand" it with the requirement that NMFS remedy the alleged deficiencies.  They also sought their fees, costs, and expenses.

In September 2001, the parties submitted to the district court a joint proposal for briefing and discovery.  See Local Rule 16.1.  In the proposal, the plaintiffs requested that the court

---

Atlantic sea scallop fishery, which extends from Maine to North Carolina.  The Atlantic Sea Scallop Fishery Management Plan was created in 1982, and since has been amended several times.  In 1993, Amendment 4 to the scallop FMP established a procedure whereby management measures could be altered through so-called "framework adjustments" to respond to the changing needs of the fishery.  This procedure allowed the Council to develop, over the course of two public Council meetings, a framework adjustment that is submitted to the Regional Administrator of NMFS for review. Upon approval of the Regional Administrator, the framework adjustment becomes a final rule.  See 50 C.F.R. § 648.55 (setting forth framework adjustment procedures).

[3]The plaintiffs also alleged violations of the National Environmental Policy Act of 1969 ("NEPA"), 42 U.S.C. §§ 4321-4347. The district court rejected these claims, and the plaintiffs have not pursued them on appeal.

expedite the case pursuant to 16 U.S.C. § 1855(f)(4).[4]  Over the next few months, the parties filed cross motions for summary judgment.[5]  The district court heard argument on the motions in May 2002.  By September 2002, no decision had issued, and the plaintiffs renewed their request to expedite the case, alerting the court to the fact that Framework 14 would expire by its own terms in March 2003.

On October 31, 2002, the district court denied the plaintiffs' motion for summary judgment and granted the defendants' motions.  See Conservation Law Found. v. United States Dep't of Commerce, 229 F. Supp. 2d 29 (D. Mass. 2002).  The court found that the Magnuson-Stevens Act did not mandate public comment for a rule such as Framework 14 and that the public comment period required under the APA had been waived for good cause.  See id. at 34 n.10.  The court also concluded that NMFS had considered the substantive issues raised by the plaintiffs and did not act arbitrarily and capriciously in implementing Framework 14.  See id. at 34.  The

---

[4]Section 1855(f)(4) provides: "Upon a motion by the person who files a petition under this subsection, the appropriate court shall assign the matter for hearing at the earliest possible date and shall expedite the matter in every possible way."

[5]Appellant Fisheries Survival Fund ("FSF") intervened as a defendant in the underlying action on September 10, 2001.  FSF is an organization of Atlantic sea scallop fishermen.

plaintiffs appealed. On March 1, 2003, while this appeal was pending, Framework 14 was superseded by Framework 15.[6]

## II. Analysis

### A. Mootness

We turn first to the question of mootness. See Roe v. Wade, 410 U.S. 113, 125 (1973) ("The usual rule in federal cases is that an actual controversy must exist at stages of appellate or certiorari review, and not simply at the date the action is initiated."). The defendants contend that the expiration of Framework 14 rendered this case moot. See Gulf of Maine Fishermen's Alliance v. Daley, 292 F.3d 84, 88 (1st Cir. 2002). As the parties invoking the mootness doctrine, the defendants bear a "heavy" burden in attempting to establish its applicability. Mangual v. Rotger-Sabat, 317 F.3d 45, 61 (1st Cir. 2003). And should they merely cease voluntarily the conduct originally challenged, they must demonstrate that it is "absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur." Id. (citing United States v. Concentrated Phosphate Export Ass'n, Inc., 393 U.S. 199, 203 (1968)).

The defendants attempt to carry this burden with respect to both of the plaintiffs' claims by citing to Gulf of Maine, a case in which we affirmed the district court's finding of mootness

---

[6]Framework 15 expires on March 1, 2004. See 68 Fed. Reg. 9580, 9581 (Feb. 28, 2003).

where a challenged framework affecting groundfish was superseded while cross motions for summary judgment were pending.  See 292 F.3d at 87.  In that case, an organization of commercial fishermen alleged that a framework was both procedurally deficient for lack of adequate notice and comment and substantively unlawful because of its closure of inshore fishing areas.  See id.  The appellant urged us to find that the alleged harms continued, despite the promulgation of subsequent frameworks, and that the issues therefore were not moot.  See id. at 88.  We rejected that argument, concluding that the promulgation of a new framework in compliance with procedural guidelines and based on new data rendered the challenges to the superseded framework moot.  See id.

CLF and Oceana respond with arguments similar to those made by the appellant in Gulf of Maine.  As to their substantive challenge to Framework 14, they contend that the harms caused by NMFS's failure to close the four fishing areas were perpetuated through Framework 15.  This, they say, means that their substantive claim remains live, and for support they rely heavily on Northeastern Florida Chapter of the Associated General Contractors of America v. City of Jacksonville, 508 U.S. 656 (1993).  There, a challenged ordinance that accorded preferential treatment to minority businesses for city contracts was repealed and replaced with a modified version weeks after the Supreme Court had granted certiorari.  See id. at 660-61 (noting three alterations in

ordinance, including adoption of five- to sixteen-percent "participation goals" in place of ten percent "set-aside" of city contracts earmarked for minority businesses). These modifications were not enough to render the controversy moot. The Supreme Court concluded that "[t]here is no mere risk that [the city] will repeat its allegedly wrongful conduct; it has already done so." Id. at 662. The analogy to Northeastern Florida is useful here.

On its face, Framework 15 is largely an extension of Framework 14. See Fed. Reg. 9580, 9581 (Feb. 28, 2003) (noting that Framework 15's only modification of the management measures that previously had been in effect was an increase in certain limits on the amount of scallops that could be held on board a fishing vessel). And as a practical matter, it appears that Framework 15 was designed merely to maintain the status quo until NMFS could complete a more comprehensive overhaul of its management measures through an amendment to the scallop FMP.[7] NMFS states that Framework 15 is based on entirely new data about the condition

---

[7]Framework 15's scope was described in the Federal Register:

> Framework 15 was developed during the later stages of development of Amendment 10 to the FMP . . . because it was clear that Amendment 10 would not be implemented by the start of the 2003 fishing year and, therefore, Framework 15 is considered to be an action of limited scope, which is intended to be a stop-gap measure until Amendment 10 is implemented.

68 Fed. Reg. 9580, 9581 (Feb. 28, 2003).

of the scallop resource, NMFS Br. at 23, 27-28; cf. Gulf of Maine, 292 F.3d at 88, but it identifies no portion of the record to support this assertion. See Mulvihill v. Top-Flite Golf Co., 335 F.3d 15, 28 (1st Cir. 2003) (declining to consider argument where litigant "ma[de] no attempt either to marshal the pertinent facts or to engage in reasoned analysis"); see also United States v. Zannino, 895 F.2d 1, 17 (1st Cir. 1990) ("[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived."). In any event, we have studied the record with care and cannot tell whether and to what extent Framework 15 was developed with new underlying data. Consequently, we cannot say that the challenged conduct will not recur or has not already recurred. See Northeastern Florida, 508 U.S. at 662.

Whether we characterize the expiration of Framework 14 as a "voluntary cessation" of conduct by NMFS subject to the same standards as in Northeastern Florida, the core question Article III compels us to ask is whether our adjudication of the issue can grant meaningful relief. Cf. Gulf of Maine, 292 F.3d at 88. Here, it appears that the same allegedly harmful scheme continues. No matter how the issue is framed, we have no difficulty concluding that, where a challenged regulation continues to the extent that it is only superficially altered by a subsequent regulation, we are capable of meaningful review. See Schall v. Martin, 467 U.S. 253, 257 n.2 (1984) (concluding that changes in general statutory scheme

did not moot challenge where contested provision remained the same); Brockington v. Rhodes, 396 U.S. 41, 43 (1969) (per curiam) (finding that suit attacking requirement that nominating petitions be signed by seven percent of voters on ground that no more than one percent could be required was not mooted by new statute reducing signature requirement to four percent); Keyishian v. Board of Regents of the University of the State of New York, 385 U.S. 589, 596 (1967) (noting that abandonment of requirement that employees disclaim membership in Communist party did not render challenge to constitutionality of procedure moot where underlying statutes and regulations remained). The plaintiffs' challenge to the substance of Framework 14 is not moot.

As to their procedural challenge to Framework 14, CLF and Oceana begin their response to NMFS's mootness arguments by acknowledging that Framework 15 was promulgated in a procedurally proper manner. Yet, the plaintiffs argue, their challenge remains live because NMFS's conduct is "capable of repetition, yet evading review." See Gulf of Maine, 292 F.3d at 88-89 (quoting Weinstein v. Bradford, 423 U.S. 147, 149 (1975)). The defendants again point to Gulf of Maine, in which we rejected the application of this exception and found the issue moot. See id. at 89.

Although the parties present compelling arguments on both sides of the debate, we find that a more straightforward resolution of the issue is readily available on the facts of this case. NMFS

has not shown, as it must, that the alleged procedural deficiency will not recur. See Friends of the Earth, Inc. v. Laidlaw Envtl. Servs., 528 U.S. 167, 189 (2000) (requiring, in cases involving voluntary cessation of challenged conduct, that party claiming mootness satisfy heavy burden of demonstrating that allegedly wrongful behavior could not reasonably be expected to recur).  To the contrary, NMFS maintains that the Magnuson-Stevens Act does not require notice and comment for framework adjustments.  Likewise, NMFS argues that its routine waivers of notice and comment under the APA have been wholly proper.[8]  The fact that NMFS voluntarily provided a public notice period in promulgating Framework 15 therefore does not suggest a change of heart as to whether the process was legally required.  Rather, as NMFS's counsel acknowledged at oral argument, the public notice period preceding

---

[8]NMFS has waived notice and comment for "good cause" in promulgating all but two of the first fourteen framework adjustments.  See 66 Fed. Reg. 24,052, 24,055 (May 11, 2001) (Framework 14); 65 Fed. Reg. 37,903, 37,909-10 (June 19, 2000) (Framework 13); 65 Fed. Reg. 11,478, 11,479 (Mar. 3, 2000) (Framework 12); 64 Fed. Reg. 31,144, 31,148 (June 10, 1999) (Framework 11); 63 Fed. Reg. 45,939, 45,940 (Aug. 28, 1998) (Framework 10); 62 Fed. Reg. 43,469, 43,470 (Aug. 14, 1997) (Framework 9); 61 Fed. Reg. 38,404, 38,405 (July 24, 1996) (Framework 8); 61 Fed. Reg. 8490, 8491-92 (Mar. 5, 1996) (Framework 7); 60 Fed. Reg. 35,513, 35,514 (July 10, 1995) (Framework 6); 60 Fed. Reg. 33,757, 33,758 (June 29, 1995) (Framework 5); 59 Fed. Reg. 59,967, 59,968 (Nov. 21, 1994) (Framework 2); 59 Fed. Reg. 36,720, 36,722 (July 19, 1994) (Framework 1).  The framework adjustment procedure, as set forth in Amendment 4 to the scallop FMP, contemplates that the Secretary of Commerce will "waive for good cause the requirement for a proposed rule and opportunity for public comment in the Federal Register" because "the Council process will adequately satisfy that requirement."

the enactment of Framework 15 was provided "out of an abundance of caution" in light of this appeal. Under these circumstances, NMFS's voluntary cessation of the challenged conduct does not render the challenge moot. See Adams v. Bowater, Inc., 313 F.3d 611, 613-15 (1st Cir. 2002) (issue not moot where a recurrence of the challenged conduct is highly likely).

B.       **Merits**

Concluding as we do that the issues before the district court continue to present a live controversy on appeal, we turn to the merits of the case. The district court's entry of summary judgment is subject to de novo review. See Associated Fisheries, 127 F.3d at 109. In the administrative law context, however, this review is limited, even at the summary judgment stage. See id. This is because the Magnuson-Stevens Act adopts the APA standard of review, which permits a court to upset an agency action only if it is arbitrary, capricious, or otherwise contrary to law. See id. (citing 5 U.S.C. § 706(2)(A)-(D)). Therefore, our task is to determine whether the action "was consonant with [the agency's] statutory powers, reasoned, and supported by substantial evidence in the record." Id.

1.       **Substantive challenge**

CLF and Oceana contend that Framework 14 is arbitrary and capricious in failing to mandate the closure of scallop-harvesting in four areas. To succeed on this claim, they must demonstrate

that NMFS lacked a rational basis for adopting the framework. See Associated Fisheries of Maine, Inc. v. Daley, 127 F.3d 104, 109 (1st Cir. 1997). That showing may be made where "the agency relied on improper factors, failed to consider pertinent aspects of the problem, offered a rationale contradicting the evidence before it, or reached a conclusion so implausible that it cannot be attributed to a difference of opinion or the application of agency expertise." Id.

Under the Magnuson-Stevens Act, NMFS has a duty to minimize to the extent practicable (1) adverse effects on essential fish habitat ("EFH"),[9] 16 U.S.C. § 1853(a)(7); and (2) bycatch (fish that are caught but not sold or kept for personal use) and bycatch mortality, 16 U.S.C. §§ 1851(a)(9), 1853(a)(11). The plaintiffs argue that NMFS violated these statutory obligations in rejecting the closure of the four fishing areas. As they see it, NMFS's decision was irreconcilable with record evidence that the closures would be beneficial with respect to EFH and bycatch. The plaintiffs also fault NMFS's analysis, claiming that the agency ignored relevant factors they should have considered and failed to articulate a rational basis for declining to implement the closures.

---

[9]EFH refers to "those waters and substrate necessary to fish for spawning, breeding, feeding or growth to maturity." 16 U.S.C. § 1802(10).

-13-

These arguments are flawed to the extent that they consider the closure alternative in isolation, discounting numerous other restrictions on scallop fishing imposed by Framework 14. See CLF, 229 F. Supp. 2d at 34 (noting that Framework 14 maintained closures of three large scallop fishing areas, as well as "restrictions on days at sea, catch and mesh sizes, and seasonal access to sensitive areas"). Moreover, the plaintiffs essentially call for an interpretation of the statute that equates "practicability" with "possibility," requiring NMFS to implement virtually any measure that addresses EFH and bycatch concerns so long as it is feasible. Although the distinction between the two may sometimes be fine, there is indeed a distinction. The closer one gets to the plaintiffs' interpretation, the less weighing and balancing is permitted. We think by using the term "practicable" Congress intended rather to allow for the application of agency expertise and discretion in determining how best to manage fishery resources.

We also note that CLF's and Oceana's characterization of the record is somewhat faulty. NMFS in fact considered the closure alternative and other potential management measures in a Final Supplemental Environmental Impact Statement ("FSEIS") that analyzed the probable effects of Framework 14. The FSEIS concluded, inter alia, that the closures would provide only limited, short-term benefits to habitat. These benefits would be "mitigated to some

-14-

degree" because other (non-scallop) fishing would continue in the closed areas. The FSEIS also found that (1) implementing no new closures would have a greater economic benefit for the fishing seasons Framework 14 was intended to address than would the closure alternative, and (2) any long-term benefits that might accrue as a result of closures were uncertain and might not outweigh the benefits of forgoing new closures. It is not our role to second guess these determinations. See Associated Fisheries, 127 F.3d at 109 ("Even if a reviewing court disagrees with the agency's conclusions, it cannot substitute its judgment for that of the agency."). On this record, the plaintiffs have not shown that NMFS acted irrationally in implementing Framework 14 without imposing additional closures.

### 2. Procedural challenge

#### a. The Magnuson-Stevens Act

The plaintiffs argue that NMFS's failure to provide a public comment period in developing Framework 14 violated the Magnuson-Stevens Act, 16 U.S.C. § 1854(b)(1)(A). Section 1854(b) requires notice and comment for regulations prepared under 16 U.S.C. § 1853(c), namely regulations that are deemed necessary to "implementing a fishery management plan or fishery management plan amendment," or to modifying such regulations. See 16 U.S.C. § 1853(c). The district court distinguished § 1853(c) "regulations" from framework adjustments, looking to neighboring § 1855(f) for

interpretive guidance.  See CLF, 229 F. Supp. 2d at 33.  There,

Congress drew a distinction between "regulations promulgated by the

Secretary" and "actions that are taken by the Secretary under

regulations which implement a fishery management plan."  See 16

U.S.C. § 1855(f)(2).

Recognizing that a framework adjustment such as Framework

14 was implemented through an action of the Secretary of Commerce

(by his designee) after a finding by the Council that a formal

regulation was "neither necessary [n]or appropriate," the district

court concluded that framework adjustments are properly

characterized as "actions," not regulations.  CLF, 229 F. Supp. 2d

at 33.  The court found, therefore, that framework adjustments are

not subject to the public comment requirements of § 1854(b).  See

id. at 33-34.  The plaintiffs have not presented us with any basis

for doubting the correctness of the court's analysis, so we affirm

its ruling on the basis of its sound reasoning.[10]

### b.    The APA

In the alternative, the plaintiffs allege procedural harm

under the APA because NMFS failed to demonstrate "good cause" for

---

[10]Because we find that the statute distinguishes between
regulations and actions, and the framework adjustment process
easily fits into the latter category, we look no further.  We are
not persuaded that, as the plaintiffs contend, the legislative
history of § 1853(c) suggests an intent that framework adjustments
undergo public comment.  See CLF/Oceana Br. at 38-39 (citing S.
Rep. No. 194-276, at 18-19 (1996), reprinted in 1996 U.S.C.C.A.N.
4073, 4091).

-16-

waiving notice and comment. <u>See</u> 5 U.S.C. § 553(b)(3)(B). They characterize Framework 14's statement of the grounds for waiver as mere "boilerplate."[11] <u>See</u> n.8, above; <u>Natural Res. Def. Council, Inc.</u> v. <u>Evans</u>, 316 F.3d 904, 912 (9th Cir. 2003). Even if we were to agree with the plaintiffs on this point, however, any error on NMFS's part was harmless. <u>See</u> <u>Riverbend Farms, Inc.</u> v. <u>Madigan</u>, 958 F.2d 1479, 1487 (9th Cir. 1992) ("The APA requires that we take 'due account' of the harmless error rule."); <u>see also</u> <u>Save Our Heritage, Inc.</u> v. <u>FAA</u>, 269 F.3d 49, 61 (1st Cir. 2001)("The doctrine of harmless error is as much a part of judicial review of administrative action as of appellate review of trial court judgments"). We reach such a conclusion because, based on this record, the omission of a formal public comment period "clearly had no bearing on the procedure used or the substance of [the] decision reached." <u>Riverbend Farms</u>, 958 F.2d at 1487 (quoting <u>Sagebrush</u>

---

[11]Framework 14's waiver of notice and comment stated:

> [B]ecause public meetings held by the Council to discuss the management measures implemented by this final rule provided adequate prior notice and opportunity for public comment, further notice and opportunity to comment on this final rule is unnecessary. Therefore, the [Assistant Administrator for Fisheries], under 5 U.S.C. 553(b)[3](B) finds good cause exists to waive prior notice and additional opportunity for public comment.

66 Fed. Reg. 24,052, 24,055 (May 11, 2001). Waivers in eleven prior frameworks used similar, though not identical, language. <u>See</u> n.8, above.

Rebellion, Inc. v. Hodel, 790 F.2d 760, 764-65 (9th Cir. 1986));

see also Little Bay Lobster Co, Inc. v. Evans, 352 F.3d 462, 468

(1st Cir. 2003).

Here, the development of Framework 14 generated fourteen

public meetings. See 66 Fed. Reg. 24,052, 24,054 (May 11, 2001).

NMFS followed its procedures for framework adjustments as set forth

at 50 C.F.R. § 648.55, a process with which the plaintiffs were

familiar. See Riverbend Farms, 958 F.2d at 1487-88 (finding

technical noncompliance with notice requirements under Federal Land

Policy Management Act constituted harmless error where "all parties

before [the court] knew the ground rules" of the agency's weekly

procedures). The preparation of a supplemental environmental

impact statement afforded additional opportunities for public

participation usually unavailable during the framework adjustment

process.[12] The plaintiffs took advantage of these opportunities,

submitting written and oral comments prior to and during Council

meetings.[13] The plaintiffs contend that their comments were

---

[12]See Notice of Availability of Draft EIS for Framework 14, 65 Fed. Reg. 77,025, 77,026 (Dec. 8, 2000) (accepting comments until Jan. 24, 2001); Notice of Intent to prepare a Supplemental Environmental Impact Statement; request for comments, 65 Fed. Reg. 60,396, 60397 (Oct. 11, 2000) (accepting comments until November 13, 2000).

[13]See J.A. at 178-186 (Nov. 13, 2000 letter from Oceana representative); 189-192 (participation of CLF and Oceana representatives at November 14, 2000 Council meeting); 217-222 (Jan. 22, 2001 letter from Oceana representative); 443-49 (Jan. 23, 2001 letter from CLF and Oceana representatives); 268 (participation of Oceana representative at Jan. 25, 2001 Council

ignored, and that, had formal notice and comment occurred, NMFS might have decided to explore their suggested alternatives further.[14]   CLF/Oceana Br. at 44 ("Had NMFS taken public comment, NMFS might have overruled the council and adopted more protective measures.").   The administrative record does not bear this out, however.   For example, two March 2001 decision memoranda from NMFS's Regional Administrator to NOAA's Acting Assistant Administrator for Fisheries analyze the concerns raised by the plaintiffs.   These analyses occurred before Framework 14 was finalized.   The plaintiffs disregard the significance of this agency-level consideration of their concerns, choosing to emphasize the ways that the Council may have slighted them procedurally.[15] Further, the plaintiffs fail to identify any comment that they were prevented from making because of this alleged procedural defect that would have made a difference in the result.   See Little Bay Lobster, 352 F.3d at 468.   The plaintiffs have demonstrated that

_____

meeting).

[14]The plaintiffs also rely heavily on Natural Resources Defense Council, Inc., 316 F.3d at 912, in which the Ninth Circuit found that NMFS made an insufficient showing of good cause to waive the APA public comment period.   In that case, however, neither party briefed the issue of harmless error.   See id. at 912 n.10.   The court interpreted this silence as an admission by NMFS that some prejudice resulted.   See id.   NMFS has not made a comparable admission here.

[15]The plaintiffs alleged that, because public comment periods closed the day before Council meetings, the Council was not giving due consideration to their concerns.

some of their suggestions were rejected, but not that they were ignored.  In this context, the difference is important.  We find no prejudice.

## III. Conclusion

For the foregoing reasons the judgment of the district court is **AFFIRMED.**